SONTAG'S SHOE STORES *v.* UNITED STATES

No. 5797.—Invoices dated, Guadalajara, Mexico, June 20, 1938, etc.
Entered at Miami, Fla., July 18, 1938, etc.
Entry No. M–22, etc.

(Decided January 28, 1943)

*S. Pierre Robineau* (*Amos Benjamin* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks* and *Frank E. Carstarphen*, special attorneys), for the defendant.

CLINE, Judge: These three appeals for reappraisement were consolidated for trial. The imported merchandise consists of sandals, invoiced as "huaraches," imported from Guadalajara, Mexico. The invoice in reappraisement No. 128684–A, which covers an importation from Mexican Indian Artcraft, was certified on June 1, 1938; that covered by reappraisement No. 128863–A, which is an importa-

tion from "Guadalajara" Huarache Factory, was certified on June 11, 1938; and that covered by reappraisement No. 128682–A, which covers a shipment from James Dubin, was certified on June 20, 1938. The merchandise covered by No. 128684–A was invoiced and entered at 3.75 and 4.25, Mexican currency, per pair and was appraised at 4.87 and 5.52, plus cases and packing; that covered by No. 128683–A was invoiced and entered at 3.25 and 3.75, Mexican currency, per pair, plus packing, and was appraised at 4.30 and 5.52 per pair, plus cases and packing; and that covered by No. 128682–A was invoiced and entered at 3.50 and 4.00, Mexican currency, per pair and was appraised at 4.65 and 5.31 per pair, plus cases and packing. The notations on the invoices show that the appraisements were made on the basis of export value.

The first witness called by the plaintiff was Mr. David Sontag who is the owner of the importing company, the business of which is retailing shoes. He testified that he received from Mexican Indian Artcraft samples of the merchandise which were brought to his office; that after he received the samples he went to Mexico and visited several exporting firms making the same class of merchandise and he found that such merchandise was sold indiscriminately to anybody at the same prices; that the merchandise he bought was offered in the general market and the goods were listed at the same prices, but he did not buy any at that time because the manufacturers had no stock on hand, having shipped everything to Los Angeles; that the jobbers quoted prices in Mexican pesos; that there were other buyers and they all told him that they bought at the same prices; that he ordered samples sent to his store; that the invoice prices were the prices he paid for the merchandise and they were the actual prices quoted in the general market.

On cross-examination, the witness testified that he went to Mexico in 1938 before the instant goods were ordered and visited three or four different companies in Mexico; that the instant shipments were purchased from Indian Artcraft and "Guadalajara" Huaraches Factory; that the dealers from whom he did not purchase offered the same character of merchandise at the same prices but the dealers were selling from samples as they did not have a stock on hand; that he did not buy any merchandise while on the trip but he purchased samples and had them sent c. o. d.; that his son selected the merchandise from the samples; that he was not personally familiar with the details of what he bought. The judge presiding at the trial at that hearing asked the following questions.

Judge KINCHELOE. But about this same character of merchandise, was that offered by other manufacturers down there? I mean the same character of merchandise, in grade and in quality that you bought.

The WITNESS. I bought the cheaper stuff; I didn't buy any good stuff.

Judge KINCHELOE. I don't think you understand what the court said. You testified a while ago that the price you paid was the price that was offered by other exporters down there. Was the merchandise that those people offered at the same price the same character of merchandise as this?

The WITNESS. Yes, sir. I didn't know anything about this merchandise when I went down there; this was the first time I saw it.

On redirect examination the witness testified that any other purchaser in the United States could have gone to the various factories in Guadalajara and purchased the same type of sandals for the same prices that he paid and he received no special prices.

The next witness was Mrs. Bertha J. Fisher who is employed as bookkeeper by the importing firm. She testified that she received the invoices and the drafts for payments and turned over all of the documents she received to their customs broker to make the entries and the customs broker told her how much duty was due on the merchandise; that the samples which came from Mexico were sent by eight or nine different companies and she named four besides those from whom goods were purchased; that in reply to a request for information concerning the market value of the goods, she received a letter from Mexican Indian Artcraft Co. That letter, which was sworn to before the United States consul, was admitted in evidence and marked exhibit 1.

The witness testified further that the letter (exhibit 1) refers to two of the shipments herein involved; that she sent an affidavit to the sales manager of the "Guadalajara" Huaraches Factory but received a reply stating that he was no longer with the concern and had gone to Los Angeles; that she knew the particular samples sent to Sontag's Shoe Stores were the same type of samples sent to other importers in Miami because she had seen the shoes in other stores in town who were selling them at the same prices at which her firm sold, but she did not know whether they were from the same exporters; that all of the samples she saw from the different exporters were of the same kind of merchandise and the same prices were on the tags.

On cross-examination, the witness testified that she could not remember all of the prices or all of the item numbers; that the prices from the different manufacturers varied 3 or 4 cents; that Mr. Sontag, Jr., selected two types of merchandise and he bought more from one firm than from the other; that one type was woven a little closer and a little better than the others; that the prices she recognized had had the customs duties and transportation added.

On redirect examination the witness testified that the importer paid the invoice prices and the merchandise was entered at those prices.

The case was then continued until the next calendar in order to take the testimony of Mr. Sontag's son who was absent from the city on the first day of trial. When the hearing was resumed, the plain-

tiff called Miss Mayme Tyre, who is a customs broker. She testified that Mrs. Fisher brought to her office all of the invoices for making the entries; that in making the entries she determined the rate of exchange of the Mexican currency by examining the Treasury decision showing the Federal Reserve rate on the dates of exportation and that she computed the amount of duty and presented the entries at the customhouse; that after she computed the amount of duty she notified Sontag's Shoe Stores and they brought the money for the payment of the estimated duties; that when the invoices were given to her, she was not asked to make any alterations in the amount.

The next witness called by the plaintiff was Mr. Albert A. Sontag who is the son of the owner of the importing firm. He testified that his father went to Mexico and sent him samples of huaraches from three or four different concerns and there may have been more; that he ordered but one quality out of all of the samples, some with flat heels and some Cuban heels and some had open toes and others closed toes, all different styles of the same quality; that price tags were attached to the samples and he merely picked out the style and determined the sizes and sent in the orders to two firms; that the prices on the sandals from different concerns were uniform; that the samples came directly from the manufacturers and the prices on the invoices were the same as those on the tags; that the basis of selection was style and not price.

The witness testified further that other importers were importing the goods at the same prices; that no attempt was made by the Sontag's Shoe Stores to get any special concessions in price and, as far as he knew, there were no concessions given and anyone could have bought the same merchandise at the prices he paid.

On cross-examination the witness admitted that he merely assumed that other importers were importing the goods at the same prices and did not know of his own knowledge; that all he knew about prices was derived from an inspection of the tags on the samples and he had not been in Mexico and had no knowledge of the prices at which the goods were sold there; that his father did not communicate with him while in Mexico; that he assumed that his father selected the samples and had them sent; that four or five firms sent samples, and, after he looked at them, he decided that they were not the types of sandals he wanted; that he did not know whether the prices on the invoices were foreign values or export values and he made no effort to find out; that Mrs. Fisher took the invoices and any other papers which accompanied them to the customs broker, but he did not remember what papers arrived; that he personally did not visit the customs broker and had no contact with her.

On redirect examination the witness testified that he did not know whether the prices were wholesale prices or retail and that he merely ordered from the samples.

On recross-examination the witness was asked and answered the following questions:

R. X Q. Do you know whether these were purchased or had been sold, rather, to your concern on a fixed rate of exchange, rate being 3.6 pesos on the dollar? Do you know that?—A. I called up the bank, we called up the bank a number of times, and they told us one time it was 3.6, that is right.

R. X Q. All right. Do you know whether or not the computation as to the values in American currency were made on the basis of 3.6 pesos per dollar?—A. Well, I never figured those invoices; I don't know.

*      *      *      *      *      *      *

R. X Q. Did you know that the goods as entered here, that the basis of exchange was at a different figure than 3.6 pesos and that the 3.6 pesos on the dollar would have amounted to .277, whereas the price at which they were entered in pesos resolved in American currency amounted to the figure of .209?

Judge CLINE. The question is, Do you know that?—A. No, I don't.

The defendant called as a witness Mr. L. R. Curry who is a customs examiner located at Miami. He testified that he examined the merchandise covered by the entries herein involved and answered the following questions with respect to the appraisement:

Q. Will you refer to the invoice that is in the record and see whether there is any reference to their being sold at a fixed rate of exchange or on a fixed rate of exchange?—A. Yes, sir, entry number M-9.

Q. What does it say?—A. Says in Spanish, "Pagadero en Moneda Americana al tipo oficial de 3.60."

Q. What does that mean?—A. To be paid in money at the official rate of 3.60 Mex.

Q. And what was the date of that invoice?—A. Certified June 11, 1938.

Q. Do you know what the fixed rate of exchange was, how many pesos to the dollar on or about the date that these huaraches were exported from Mexico?—A. Yes; .277, plus.

Q. And will you please refer to the figure at which they are invoiced? Take any one line of them that they were invoiced on the entry as made or in the entry as made.—A. The rate of exchange, at any rate?

Q. Yes.—A. .208125.

Q. And what do you mean by .208125; cents?—A. Cents, yes; United States money.

Q. So then there was a difference between .277 United States money and .208125 United States money?—A. Yes, sir.

Q. And you fixed your appraisal, did you, basing it at the value that would be shown at the fixed rate of exchange in the United States currency, as of that day?—A. Yes, sir.

Q. And what difference was there in the figures that it would have been computed at if properly computed and the price at which they entered it in dollars? Probably your final report would show that?—A. They would be computed, one lot at 4.30 Mexican currency, per pair, dollars, and the others at 5.52 Mexican currency, per pair.

Q. Well, if they had been entered at the rate that you say was the fixed rate of exchange at that time what would have been the proper figure?—A. That is shown on the invoice.

Q. Will you please state for the purpose of the question——A. That was Mexican money, $3.75 and $3.25.

Q. Taking it—were there other examples similar to that?—A. Yes, sir.

Q. Other lines?—A. Yes, sir.

Q. Did you find that prevailed throughout, that the person making the entry had used a different rate of exchange?—A. Yes, sir.

\* \* \* \* \* \* \*

Judge CLINE. Is the question here on the unit value or the rate of exchange?

The WITNESS. Yes.

Judge CLINE. What is the question here, on the rate of exchange?

The WITNESS. Yes, ma'am.

Judge CLINE. Is there a dispute on the conversion of the currency or the rate of exchange or on the unit value?

The WITNESS. It is both. It is on the rate of exchange and the unit value, too.

By Mr. CARSTARPHEN:

Q. And also am I correct in assuming that there is a question of whether it was foreign or export value, and that the Government held it was export value?—A. That is right, yes, sir.

On cross-examination the witness was asked the following questions.

X Q. When this merchandise came in you say entry M–9 came in at a fixed rate of exchange?—A. Yes, sir.

X Q. Did entry M–22 have a fixed rate of exchange on it?—A. Not on the invoice, no.

X Q. Then why, upon what basis did you decide that that was also under a fixed rate of exchange?—A. From information I had in my possession.

X Q. What information?—A. Confidential information.

\* \* \* \* \* \* \*

X Q. Was your sole basis of reappraisement the rate of exchange?

Mr. CARSTARPHEN. Excuse me. Are you referring now to the one or to all three?

Mr. BENJAMIN. All three.

A. At the rate of exchange—what was the question?

(The question was read by the reporter.)

A. The rate of exchange would show the export value of the merchandise.

X Q. Then you have appraised this on the export value, is that correct?—A. Yes.

X Q. And you used the rate of exchange on all three entries as being the basis of export value?—A. Yes.

X Q. And that was 3.6, is it—what was that rate of exchange?—A. .277.

X Q. Is that the basis you used?—A. Yes.

X Q. Did you find in your examination of the imported huaraches any undervaluation as to the actual value of the merchandise, other than the basis of the rate of exchange difference?—A. No.

Exhibit 1, which is a letter addressed to Sontag's Shoe Stores by Victor E. Gaysinsky, the owner of Mexican Indian Artcraft Co., contains the following statements:

With reference to our shipments of sandals to you dated June 1st and June 20th, 1938, I wish to say that payment for these was received by me in U. S. Cy. at the then current rate of exchange to my entire satisfaction. The price at which these sandals were sold to you was the same price I would have charged any other buyer for the same lot of shoes and was considered by me a fair price for all concerned.

The testimony of the examiner as to how he arrived at the appraised value is somewhat vague. He stated that there was a difference between the fixed rate of exchange shown on the invoice covered

by reappraisement 128683–A and the legal rate, that is, a difference between 3.60 pesos to the dollar, or 0.277 cents, and the legal rate 0.208125 cents, and he appraised the merchandise on the so-called fixed rate of exchange. It appears to the court that, inasmuch as he found the value in pesos, he must have converted the currency of the invoice into United States dollars by using the so-called fixed rate of exchange 3.6 to the dollar or 0.277 and then converted the sum in United States dollars thus found back into pesos, using the correct rate of exchange, 0.208125. The value was found by computation.

In *United States* v. *Alatary Mica Co.*, 19 C. C. P. A. 30, T. D. 44871, the court held that an appraisement by the United States Customs Court was invalid where the court estimated the value by a method of computation, citing *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T. D. 42714.

The defendant cites *Giovanni Ascione* v. *United States*, 32 Treas. Dec. 725, T. D. 37252, G. A. 8077, and *United States* v. *José Ferrari et al.*, Reap. Dec. 2489, in support of the appraiser's action in appraising the merchandise in this case. In the *Giovanni Ascione* case, *supra*, the merchandise consisted of cameos from Italy which were invoiced at a price in United States currency. The merchandise was appraised in Italian currency and the appraiser converted the currency to United States dollars by using the current rate of exchange and found the appraised value in United States currency. The court held that the currency of the country of production was the proper currency for appraisal and that the appraiser's valuation in Italian lire was correct but that the importer was not injured by the action of the appraiser in converting the currency because he used the correct rate of exchange and the collector would have arrived at the same value in United States dollars if he had converted the currency. After citing numerous decisions holding that it is not within the province of the appraiser to convert the currency, the court said:

In the case at bar I had some doubt just what to do. The appraiser found the value in lire, as he should, but he then transposed the lire into the equivalent of American dollars, evidently at the proclaimed value. In so doing I think he was without authority. What he should have done was to find the value of the merchandise in lire, as he did, but not attempt to convert it into American money. If he did, it did not bind the collector. What the collector wishes to know is, What was the value of the merchandise in the country of exportation in the currency of that country? Then he will do the rest. But as it was shown that in so doing he has not committed a wrong against the importer, I will approve the value without sustaining the act of transposition. It being unquestioned the value he found was in lire, that part of his act I approve. His conversion I will sustain, because he followed the correct rule, but I do not believe that method of appraising merchandise should be followed by the appraiser. He should find the value of the merchandise in the markets of the country of exportation and in the currency of that country. Then he should stop, and permit those whose duty it is to convert it so to do.

In the *José Ferrari* case, *supra*, the merchandise consisted of perfumery imported from Spain and invoiced in Spanish pesetas. Some of the invoices contained a notation at the bottom fixing the number of pesetas to be exchanged for the United States dollar at the rate of 6.70 pesetas per dollar. A cablegram received from the shipper was introduced in evidence stating, "Due to depreciation peseta new orders will be accepted only on a basis of payment in dollars reducing invoiced value pesetas at rate of 6.70." The court said:

There does not appear to be any appearance nor any evidence or argument on behalf of the defendant in this case.

From the evidence presented at the trial of this case it appears that the manufacturer, instead of raising the export prices of its produce in order to meet the depreciation of the currency in Spain, elected to take the average quotation for pesetas during the year 1929 as a basis for converting the list prices into United States dollars. It seems to us, therefore, that the proclaimed rate of exchange for pesetas or the daily fluctuating rate of exchange did not in any way affect the prices paid to .the manufacturer for his product, and the question of exchange does not enter into the selling prices of the merchandise. Each article upon the invoice is sold at the rate of 6.7 pesetas to the United States dollar, and the effect is the same as though the merchandise was invoiced in United States dollars.

We hold, therefore, that the dutiable value of the merchandise is the invoiced and entered prices in pesetas converted into United States dollars at the rate of pesetas 6.7 to the dollar, less discounts as invoiced.

On the other hand, in *Collin & Gissel* v. *United States*, 72 Treas. Dec. 1210, Reap. Dec. 4183, the court held that any action by the appraiser in converting currency would be void. In that case the merchandise was invoiced and entered at values in United States dollars. The appraiser discovered a notation on two out of three of the invoices showing that the currency of purchase was reichsmarks at an agreed rate of exchange of 4.20 per dollar and made his appraisements at the invoice values, noting, however, that the currency should be converted at 4.20 marks per dollar. The collector notified the importers that the values of the merchandise had been advanced on appraisement and the importer filed appeals for reappraisement. At the trial counsel for the importer conceded that the appraisements were correct but contended that there was no advance because any conversion of the currency by the appraiser had exceeded his powers and invaded the duties of the collector. In deciding the case, the court said:

From the papers, taken as a whole, there is some little confusion about the situation. However, it seems clear that if the appraisement can be construed as attempting to make the subsequent conversion of currency a part of the appraisement, as claimed by the importers, as to that it would be void and of no effect. We prefer to construe it as made within the law, and as not having that effect, so that the *per se* portion of the appraisement will stand, as we think it was intended, and that the currency conversion will take place subsequently in due course by the collector of customs. As we interpret the decision of the judge below we believe the appraised value was affirmed on that theory alone.

The notice of advance could not have related to the advance of the *per se* unit values for they were affirmed as invoiced. It may have been a mistake or miscalculation or it may have referred to currency conversion; in either case it was void and of no legal effect.

It is apparent that the weight of authority is to the effect that the appraiser cannot convert the currency of the unit price of merchandise in making an appraisal. Accordingly, I hold that the appraisements in this case were void, insofar as the unit prices of the articles were concerned, because they were based upon a wrong principle. The appraiser did not attempt to find the values at which the sandals were freely offered for sale in Mexico for exportation to the United States on the various dates of exportation, but based his appraisal on the theory that the importer paid more for the merchandise because one of the invoices indicated that it was sold on the basis of a fixed rate of exchange. Exhibit 1 shows that the other two shipments were sold on the basis of the *current* rate of exchange. However, there is nothing in the record to indicate that the appraiser erred in adding the costs of cases and packing.

The uncontradicted testimony shows that the merchandise was freely offered for sale in Guadalajara, Mexico, for export to the United States, by several dealers at the unit prices shown on the invoices and that the same prices were on the tags attached to the samples which were sent to the importing company for the purpose of ordering the styles desired. Nothing appears in the record in regard to the usual wholesale quantities in which the merchandise was offered for sale, but, inasmuch as it is apparent from the evidence that offers were freely made at the same prices without regard to the quantities purchased, the absence of evidence showing the usual wholesale quantities of the merchandise is immaterial. *United States* v. *Alfred Kohlberg, Inc.*, 2 Cust. Ct. 849, Reap. Dec. 4526; *Jenkins* v. *United States*, 25 C. C. P. A. 90, T. D. 49093.

I find that the weight of evidence supports the following facts:

1. Guadalajara was the principal market in Mexico for the sale of sandals or huaraches like those herein involved, in the usual wholesale quantities and in the ordinary course of trade at the time of the exportations under consideration.

2. Shortly prior to the exportations in this case such merchandise was freely offered for sale to all purchasers and was sold at prices which were the same as the unit invoice values in this case. Such sales were made from samples, as all of the stock on hand had been sold and shipped to purchasers in Los Angeles, Calif.

3. There is nothing in the record to show that the appraiser erred in adding the charges for the costs of cases and packing.

I hold as a matter of law that export value, as defined in section 402 (d) of the Tariff Act of 1930, is the proper basis for appraisement,

no higher foreign values having been established, and that such export values are the unit invoice prices, plus the charges for cases and packing as returned by the appraiser. Judgment will be entered accordingly.